UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   17-80070-CR-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA

v.

**RICHARD FERNANDO BOTERO,**
a/k/a "Richard Fernando Botero Guevara,"

      Defendant.
_____/

**FACTUAL PROFFER**

      Defendant Richard Fernando Botero, a/k/a "Richard Fernando Botero Guevara," his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and the following facts are true and correct and are sufficient to support a plea of guilty:

      1.    At all times relevant to the Indictment, treatment for substance abuse involved the use of prescription controlled substances, that is, Buprenorphine HCl and Naloxone HCl separately or in combination, in order to wean addicts off of illegal opioids, including heroin. Brand names of these medications include Suboxone and Subutex (these drugs will be jointly referred to as "Buprenorphine"). Only licensed physicians can prescribe these medications. Because these drugs are Schedule III controlled substances, meaning that there is a strong potential for abuse, resulting in fatal and non-fatal overdoses, prescribing physicians also must have two registrations with the U.S. Drug Enforcement Administration. The first registration is the standard "DEA number," required to prescribe any controlled substance. The second registration is a "DEA X-number," which is granted to a limited number of physicians with valid "DEA numbers" and who complete a training program on substance abuse treatment and fulfill other regulatory requirements. BOTERO does not have a DEA number or a DEA X-number because he has no training or licensure as a physician. Co-defendant CUARTAS also did not hold any medical licensure, despite holding herself out publicly as a nurse, nurse practitioner, ARNP, and in some instances, a doctor.

      2.    Reflections Treatment Center was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County, in the Southern District of Florida. REFLECTIONS purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction.

3. Deerfield Medical Center ("DMC") was located at 7552 Wiles Road, #B213, Coral Springs, Florida 33067, in Broward County, in the Southern District of Florida. DMC operated as a "doctors group" and provided medical services to patients at REFLECTIONS and other substance abuse treatment facilities, including facilities located in Palm Beach County. The medical services for substance abuse treatment patients included patient visits and evaluations, providing prescriptions for bodily fluid testing, and providing prescriptions for drugs, including controlled substances such as Buprenorphine and Alprazolam. KENNETH CHATMAN contracted with BOTERO and DMC to provide the aforementioned services.

4. Oxycodone, buprenorphine (a/k/a suboxone), methadone, and alprazolam (a/k/a Xanax) are controlled substances with a high potential for abuse. They can only be lawfully prescribed by a licensed physician with an active DEA number for a legitimate medical purpose and within the bounds of professional medical practice. A doctor who does not have a valid medical license or the necessary DEA registration is not practicing within the bounds of professional medical practice. Also, because of their potential for abuse, prescriptions for these drugs can only be written by the treating physician after personally examining the patient and determining that the medication is medically necessary.

5. In 2012, BOTERO hired Dr. Cesar RAMIREZ-HERMOSO to work at DMC. Co-defendant CUARTAS told RAMIREZ-HERMOSO, while he was working at DMC, that she was a nurse practitioner and she asked him to pre-sign multiple blank prescriptions. CUARTAS would then fill in the patients' names and drug type and drug amount and give them to the patients without RAMIREZ-HERMOSO ever seeing the patient. These prescriptions were for buprenorphine and for other controlled substances, including oxycodone, morphine sulfate, methadone, and alprazolam. CUARTAS knew that RAMIREZ-HERMOSO did not have the appropriate DEA X-number to write prescriptions for buprenorphine and CUARTAS filled out application paperwork and took the buprenorphine protocol exam in RAMIREZ-HERMOSO's name in an attempt to get a DEA X-number for RAMIREZ-HERMOSO. BOTERO was aware that CUARTAS was filling in the pre-signed prescriptions and giving them to patients.

6. In late 2013, RAMIREZ-HERMOSO's medical license was suspended and later revoked and, thus, he could no longer see patients or prescribe medications. BOTERO knew that RAMIREZ-HERMOSO lost his medical license because BOTERO assisted RAMIREZ-HERMOSO in hiring an attorney for RAMIREZ-HERMOSO's Board of Medicine disciplinary hearing. That hearing occurred on December 6, 2013, and RAMIREZ-HERMOSO's license was suspending on December 23, 2013. RAMIREZ-HERMOSO told BOTERO of the decision and, within days thereafter, RAMIREZ-HERMOSO closed his medical practice. BOTERO assisted RAMIREZ-HERMOSO in vacating his office and moving RAMIREZ-HERMOSO's medical equipment, furniture, and records to DMC. BOTERO knew that RAMIREZ-HERMOSO ceased practicing medicine at that time. RAMIREZ-HERMOSO was arrested on May 5, 2014 and charged with conspiring to commit health care fraud and unlawfully distribute oxycodone. He has remained in federal custody since that date.

7. In 2014, co-defendant CUARTAS recruited co-conspirator Dr. Donald WILLEMS to work at DMC. BOTERO agreed to hire WILLEMS based on CUARTAS's recommendation.

BOTERO and CUARTAS knew of WILLEMS' pending Broward County charges for unlawful dispensing of prescription narcotics and the fact that WILLEMS had lost his DEA number. BOTERO, CUARTAS, and WILLEMS agreed that WILLEMS would provide medical services to DMC and REFLECTIONS patients by using forged and/or pre-signed prescriptions because WILLEMS could not legally dispense controlled substances.

8. Despite knowing that RAMIREZ-HERMOSO had lost his medical license and could not prescribe any medications, and despite knowing that WILLEMS had lost his DEA number, BOTERO and CUARTAS ordered prescription pads for DMC that contained the names, medical license numbers, and DEA numbers of RAMIREZ-HERMOSO, WILLEMS, and DOCTOR #1. RAMIREZ-HERMOSO was already in prison and WILLEMS had already lost his DEA number when these prescription pads were ordered. These prescription pads were used by WILLEMS and CUARTAS to prescribe Buprenorphine and alprazolam for REFLECTIONS patients, and to prescribe oxycodone, methadone, morphine sulfate, buprenorphine, and alprazolam for other DMC patients despite the fact that DOCTOR #1 never authorized the use of his DEA numbers or medical license. Some of the prescriptions contained the forged signature of DOCTOR #1.

9. WILLEMS, under the direction of BOTERO and CUARTAS, treated patients at REFLECTIONS and DMC, ordered medically unnecessary urine tests that he never reviewed, and illegally prescribed Buprenorphine and other controlled substances that were ultimately billed to health plans by KENNETH CHATMAN, REFLECTIONS, various lab facilities, and various pharmacies. BOTERO also knew that CUARTAS, who had no medical licensure or training as a nurse, also was treating patients at REFLECTIONS and DMC.

10. CUARTAS filled prescriptions for opiate based pain medications and other controlled substances, including oxycodone, buprenorphine, morphine sulfate, methadone, and alprazolam, for employees and patients of DMC. CUARTAS not only filled out the prescriptions, but she also forged doctors' signatures.

11. In September 2014, co-conspirator GONZALEZ began receiving forged prescriptions for oxycodone from CUARTAS. To make extra money, GONZALEZ would fill the prescriptions at a pharmacy dictated by CUARTAS and then sell the pills back to CUARTAS for $1,200 to $1,300. Each prescription was for a bottle of 120 pills of 30 mg oxycodone. GONZALEZ would pay $420 cash to the pharmacy to receive the pills. These prescriptions were written allegedly in the name DOCTOR #1, but DOCTOR #1 never examined or treated GONZALEZ.

12. In 2015, BOTERO learned of the arrangement between CUARTAS and GONZALEZ. Subsequently, BOTERO demanded that CUARTAS continue writing the forged prescriptions, but GONZALEZ would sell the pills to BOTERO. BOTERO would pay GONZALEZ $800 for each bottle of 120 pills of 30mg oxycodone. BOTERO would re-sell these pills. This arrangement between BOTERO, GONZALEZ, and CUARTAS continued until January 2017, when BOTERO fired CUARTAS. After CUARTAS was fired, GONZALEZ filled out a

pre-signed prescription that CUARTAS had left behind for another bottle of oxycodone, filled the prescription at the pharmacy, and sold the pills to BOTERO.

13. BOTERO also received forged prescriptions for oxycodone and other drugs from CUARTAS. These prescriptions also were written in the name of DOCTOR #1, but DOCTOR #1 never examined or treated BOTERO. BOTERO would then sell the pills that he received from those prescriptions. This arrangement between BOTERO and CUARTAS continued until January 2017, when BOTERO fired CUARTAS. After CUARTAS was fired, GONZALEZ filled out a pre-signed prescription that CUARTAS had left behind for another bottle of oxycodone for BOTERO. BOTERO filled the prescription at the pharmacy and sold the pills.

14. From 2015 until January 2017, BOTERO was aware that CUARTAS also provided forged prescriptions for opiate based pain medications to other purported patients, who in turn, sold the medications back to CUARTAS. CUARTAS then sold the medications to others. CUARTAS had multiple patients whom she brought to DMC from the "pill mill" she worked at with WILLEMS. These patients received prescriptions from CUARTAS for opiate based pain medications and other controlled substances, including oxycodone, morphine sulfate, methadone, and alprazolam, despite not being patients at DMC.

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

Date: 6/8/2017

By: _____
A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

Date: 6/8/17

By: _____
LYDIA RITTAWAY, ESQ.
ATTORNEY FOR DEFENDANT

Date: 6/8/17

By: _____
RICHARD FERNANDO BOTERO, DEFENDANT